UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

UNITED STATES )
)
v. ) Docket No. 24-cr-10225-WGY
)
SAMUEL JEAN-BAPTISTE )
Defendant. )
)

**DEFENDANT JEAN-BAPTISTE'S SENTENCING MEMORANDUM**

The Defendant, Samuel Jean-Baptiste, submits this memorandum in support of his request for a sentence of 120 months imprisonment, which is "sufficient, but not greater than necessary" to comply with 18 U.S.C. §3353(a)(2).

**PROCEDURAL AND FACTUAL BACKGROUND**

On July 31, 2024, the Defendant was charged in a two-count indictment. Count 1 charged conspiracy to distribute and to possess with intent to distribute controlled substances, in violation of 21 U.S.C. § 846. Count 2 charged possession with intent to distribute more than 50 grams of methamphetamine, in violation of 21 U.S.C. § 841(a)(1).

On September 3, 2025, the Defendant pled guilty to the indictment. Pursuant to a binding plea agreement, the parties have agreed to ask for a sentence of 120 months imprisonment. The parties further agreed that the Base Offense Level was 36, which was reduced by three points for acceptance of responsibility. This would result in a final GSR of 168-210 months if a CHC of III is used. If instead, CHC II applied, then the range would be 151-188 months.

Probation has calculated the CHC as III, based on one prior case with multiple convictions. They have also calculated the Guidelines based on a Total Offense Level of 35, resulting in a range of 210-262 months.

**MR. JEAN-BAPTISTE'S HISTORY AND CHARACTERISTICS**

When Samuel Jean-Baptiste was two years old, his father was murdered. So he and his brother were at first raised by their mother, Marie Rose. PSR at ¶49. Shortly after his father was killed, they relocated from Florida to Massachusetts and resided in the Mystic View public housing complex in Somerville.

DCF quickly became involved as Mr. Jean Baptiste and his brother were often left unsupervised while his mother worked overnight shifts. PSR at ¶50. As a result, he and his brother lived in various foster homes throughout their young lives. Id. While in foster care, he was seriously assaulted twice, once with a bat and once sexually. PSR at ¶51. He also bore witness to significant trauma, as many of his foster siblings committed suicide, were victims of murder, and experienced drug overdoses. Id. In 2006, when Mr. Jean-Baptiste was approximately 20, his friend suffered a fatal gunshot wound and died in his arms. In the crossfire, the defendant got shot in his left leg. PSR at ¶64.

Though his mother is deceased and he has lost touch with other family, his close friend, King Pompulis, has supported him throughout these proceedings, as has his girlfriend, Drema Schau. PSR at ¶ 57. King says that Mr. Jean-Baptiste is "dependable", noting he "can always count on him" and views him "as a brother." PSR at ¶58. The Defendant and Ms. Schau "share a good relationship, free from

domestic violence. [Drema] is very supportive of the defendant and communicates with him daily. They hope to have children together in the future." PSR at ¶59.

Mr. Jean-Baptiste also has a history depression and anxiety, as well as substance abuse, likely due to his acute childhood trauma, and has previously considered suicide. PSR at ¶66. He first consumed alcohol at age sixteen and began to drink more after his mother passed away in 2015. After his release from prison in 2018, his alcohol use became problematic causing him to voluntarily attend self-help meetings in East Boston. Between 2022 and 2023, he attended various alcoholics anonymous sessions. Up until his arrest, he typically drank a pint and a half of liquor daily. PSR at ¶71.

He also developed a problem with prescription drugs after a motorcycle accident. Eventually, his prescribed medication was not strong enough for him and he purchased Oxycodone, Percocet, and Vicodin from friends and on the streets, sometimes spending his entire paycheck to finance his opioid dependence. He used opiates daily up until his arrest for this case. PSR at ¶72.

Despite his lengthy incarceration, Mr. Jean-Baptiste has frequently pursued educational opportunities. He graduated from Liberty High School in 2005. He participated in a plumbing vocational program in Wakefield, Massachusetts and also attended Bunker Hill Community College for six months, as well as an online paralegal program at Quincy College. Mr. Jean-Baptiste also obtained a commercial driver's license (CDL), a Department of Transportation (DOT) license, and a Sheet

Metal license, which allowed him to be employed by the Local 17 Union in Massachusetts. PSR at ¶¶79-84.

After his release from prison in 2018, Mr. Jean Baptiste worked for FedEx as a driver for several years. As outlined in this earlier request for release, he was considered a highly reliable employee. He also held occasional jobs for USPS, a nightclub, and a parking service. The defendant's close friend, King, runs a transportation company and would be able to provide Mr. Jean-Baptiste with a job when he gets out of prison. PSR at ¶¶85-91.

## ARGUMENT

### I. The Court should sentence Mr. Jean-Baptiste to 120 months imprisonment, which is sufficient and appropriate under the factors identified in 18 U.S.C. § 3553(a).

A sentence of 120 months in prison is sufficient to fulfill the statutory purposes laid out in 18 U.S.C. § 3553.[1] The primary directive in § 3553(a) is for judges to impose a sentence sufficient, but not greater than necessary, to achieve the goals of sentencing. Yet courts often arrive at the conclusion that serious criminal conduct (which this undoubtedly is) requires lengthy prison terms to

[1] Those factors include:

(1) the nature and circumstances of the offense and the history and characteristics of the defendant;

(2) the need for the sentence imposed--

(A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

(B) to afford adequate deterrence to criminal conduct;

(C) to protect the public from further crimes of the defendant; and

(D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;

effectively "punish" or "teach someone a lesson." However, when more effective solutions are available – or when those lessons are already being achieved by other means – long prison terms are counterproductive for both the offender and society. In this case, to incarcerate Mr. Jean-Baptiste for anything more than the minimum authorized by the plea is unnecessary. Instead, a 120-month sentence is sufficient to satisfy the requirements of § 3553.

## II. Mr. Jean-Baptiste should be treated as a Criminal History Category II, as his record is overstated.

The Court should depart downward from a CHC Level III because "reliable information indicates that the defendant's criminal history category substantially over-represents the seriousness of the defendant's criminal history or the likelihood that the defendant will commit other crimes…" U.S.S.G. § 4A1.3. Instead, Mr. Jean-Baptiste should be treated as a CHC Level II.

The Defendant has six criminal history points arising out of one prior criminal docket from 2007, when he was 21. In that case, he received a 10-12 year state prison sentence for a home invasion. PSR at ¶36. Because he was also convicted of other related violent offenses arising out of the same event, he received a total of six criminal history points for what was effectively one crime. See U.S.S.G. 4A1.1(d). This is excessive.

Long before *United States v. Booker,* the Sentencing Commission, recognizing the inadequacies of the criminal history scoring system, encouraged departures where "reliable information" indicated that the criminal history category

"substantially over-represents the seriousness of the defendant's criminal history or the likelihood that the defendant will commit further crimes." U.S.S.G. § 4A1.3(b)(1). Indeed, the Guidelines' scoring can be problematic because it makes no distinction between violent and non-violent offenses: an addict with a record of drug convictions could have a higher score than another defendant with a murder conviction. *See, e.g., United States v. Ennis,* 468 F.Supp.2d 228, 232 (D.Mass. 2006) (noting defendant had a criminal history category II "notwithstanding the fact that he had a murder conviction for which he had received the death penalty, later reduced to a sentence of life imprisonment from which he was paroled"); *United States v. Leviner,* 31 F.Supp.2d 23, 33 (D.Mass. 1998) ("To treat this man [Leviner] as if he were only a point on a grid ... would do violence to the purposes of the Sentencing Guidelines. It would treat someone convicted of Felon in Possession of a Firearm [the defendant's conviction] with a minor record, solely because he had a few sentences in the criminal history (1), (2), and (3) range, the same as someone with multiple, violent crimes, and multiple ten to fifteen-year sentences. It would create a new form of disparity, treating offenders that are completely different in a like way."); see also *United States v. Garrison*, 560 F. Supp. 2d 83, 88 (D. Mass. 2008) (departing from a Level VI to a Level III because many of the convictions were for minor crimes); *United States v. Leviner*, 31 F. Supp. 2d 23, 34 (D. Mass. 1998) (departing downward from a Level V by declining to count motor vehicle offenses).

Here, Mr. Jean-Baptiste has one case that counts towards his Criminal History Category. It occurred almost twenty years ago and only counts because he was released within fifteen years of this offense. Because that one case resulted in four convictions for crimes of violence, he receives six criminal history points, instead of three. This overstates his record. Instead, he should be treated as someone with three points, i.e. a CHC Level II.

## III. The Guidelines' treatment of fentanyl analogues results in a Base Offense Level that overstates the seriousness of the offense.

The Guidelines' treatment of two of the substances at issue here, acetyl fentanyl and fluorofentanyl, results in a Base Offense Level that overstates the seriousness of the offense. If they were treated, not as an analogue, but as fentanyl itself, then the Base Offense Level would be 36 and the Total Offense Level 33.

For cases involving drug analogues, the Court may consider potency when determining the appropriate sentence under the Guidelines and per 18 U.S.C. § 3553(a); see U.S.S.G. § 2D1.1, App. n.6 ("In determining the appropriate sentence, the court also may consider whether the same quantity of analogue produces a greater effect on the central nervous system than the controlled substance for which it is an analogue."); see also *United States v. Chase*, 560 F.3d 828, 832 (8th Cir. 2009) ("the standards governing departures do not bind a district court when employing its discretion with respect to variances"). The matter before the Court involves fentanyl analogues known as acetyl fentanyl and fluorofentanyl.

By way of background, on July 17, 2015, the United States Attorney General issued a notice of intent to temporarily place acetyl fentanyl into Schedule I of the Controlled Substance Act pursuant to 21 U.S.C. § 811, finding that such action was necessary to avoid imminent hazard to the public safety.[2] In support of the "temporary" scheduling of the substance, the Attorney General looked at the risk to the public health and found that the abuse of acetyl fentanyl has the same potential for danger.[3] Additional analogues, including fluorofentanyl, were temporarily and then permanently scheduled in 2018 and 2023, respectively.[4]

Despite often posing the same "qualitative public health risks as heroin, fentanyl and other opioid analgesic substances,"[5] analogue is punished over four times as harshly as fentanyl and ten times more harshly than heroin. As an illustration, to calculate the "converted drug weight" ("CDW") under the Guidelines, the Commission created the following formula:

1 gm of Heroin = 1 kg [of CDW]
1 gm of Fentanyl = 2.5 kg [of CDW]
1 gm of a Fentanyl Analogue =10 kg [of CDW]

U.S.S.G. § 2D1.1, App. n.8(D) ("Drug Conversion Tables").

---

[2] *See* DEPT. OF JUSTICE, DEA, 21 CFR Part 1308 [Docket No. DEA-413F] *available at* https://www.deadiversion.usdoj.gov/fed_regs/rules/2015/fr0717_7.htm (last visited Feb. 11, 2020).
[3] *Id.*
[4] https://www.federalregister.gov/documents/2018/02/06/2018-02319/schedules-of-controlled-substances-temporary-placement-of-fentanyl-related-substances-in-schedule-i (viewed on January 16, 2026); https://www.federalregister.gov/documents/2023/12/07/2023-26694/schedules-of-controlled-substances-placement-of-nine-specific-fentanyl-related-substances-in (viewed on January 16, 2026)
[5] *Id.*

Yet the increased punishment assigned to fentanyl analogues vis-à-vis fentanyl is particularly dubious as an empirical matter, considering that clinical studies—including testing cited by the DEA—indicate that both acetyl fentanyl and fluorofentanyl are only 30% as potent as traditional fentanyl.[6] The same fractional potency is true of several other fentanyl analogues.[7] Despite this data, all of these compounds are classified by the Commission as "fentanyl analogues," meaning that they are treated four times more severely than fentanyl simply because the Guidelines cannot keep up with the changing landscape presented by these drugs.

The effect of the Guidelines' disparate treatment of these drugs is exacerbated by the "Notes to the Drug Quantity Table," U.S.S.G. § 2D1.1(c), which states that, "[i]f a mixture or substance contains more than one controlled substance, the weight of the entire mixture or substance is assigned to the controlled substance that results in the greater offense level." In other words, for mixtures containing even a trace amount of fentanyl analogue, the Guidelines attribute the entire weight of the substance to the fentanyl analogue for sentencing

---

[6] *See, e.g., attached* Wilde, *et al.*, FRONTIERS IN PHARMACOLOGY, *Metabolic Pathways and Potencies of New Fentanyl Analogs*, *available at* https://www.ncbi.nlm.nih.gov/pmc/articles/PMC6461066/ (pub. online Apr. 5, 2019; last visited Mar. 9, 2020) (noting that testing "suggest[ed] about 30% of the analgesic potency of fentanyl"; *see also* Table 1, "Summary of the reviewed fentanyl analogs and their metabolites and metabolic pathways[,]" stating that "Acetylfentanyl" has an "[e]stimated relative potenc[y] to fentanyl" of only "0.3") (hereinafter, "*Potencies of New Fentanyl Analogs*"); DEA, Diversion Control Division, Drug & Chemical Evaluation Section, *Acetyl fentanyl (N-(1-phenethylpiperidin-4-yl)-N-phenylacetamide)*, *available at* https://www.deadiversion.usdoj.gov/drug_chem_info/acetylfentanyl.pdf (pub. Oct. 2018; last visited Mar. 9, 2020) (stating that "[p]otency of acetyl fentanyl was about 3-fold less than that of fentanyl…")

[7] *See Potencies of New Fentanyl Analogs*, Table 1.

purposes. Following this recommendation, and without regard to the amount of analogue contained in each mixture, the Probation Department in this case counted approximately 681 grams of fentanyl and analogue mixture as pure analogue (See PSR ¶20).

If, under 18 U.S.C. § 3553(a), the Court were to treat that weight instead as generic fentanyl, the Base Offense Level would be 36, as the parties calculated, not 38. But instead, because some undetermined amount of analogue was present, the entire mixture is considered analogue and a harsher sentencing range applies. This increase in Offense Level is unjustified by the chemistry and toxicology of the substances themselves and by the Government's own findings.

## IV. The requested sentence advances the other objectives embodied within 18 U.S.C. § 3553(a)(2).

A sentence of 120 months addresses all the goals of sentencing. The 18 U.S.C. 3553(a)(2) factors seek to advance the four objectives: retribution, rehabilitation, deterrence, and incapacitation. See *United States v. Tapia*, 564 U.S. 319 (2011) ("In determining the appropriate sentence, judges must consider retribution, deterrence, incapacitation, and rehabilitation…but a particular purpose may apply differently, or not at all, depending on the kind of sentence under consideration.")

Retribution refers to just deserts. What is just and the usefulness of the "deserts" is unclear. While retribution may have its place, it should not be elevated above other considerations, and to the detriment of the other three objectives. "Retribution sits uncomfortably at the intersection of two aspects of our responses to

harm: our desire for people to suffer and our desire for people to change [….] But there is another option [….] the issue is not just how we show our condemnation, but how we affirm unequivocally and powerfully the importance of what was violated, without destroying the person who violated it."[8] In other words, the most powerful form of retribution is one which demands that the offender commit himself to repairing the harm done. A long prison sentence does not accomplish this.

The other three § 3553(a)(2) goals are utilitarian, emphasizing methods to protect the public, though they differ in the mechanism. Deterrence emphasizes onerousness of punishment—this offender and potential future offenders are deterred from committing crimes because of a rational calculation that the cost of punishment is too great, and presumably because they have learned better ways of behaving. The punishment is so repugnant, the theory goes, that neither the punished offender nor the general public would commit crimes in the future. Incapacitation deprives defendants of the opportunity to commit crimes by physically detaining them in prison. Rehabilitation attempts to modify offenders' behavior and thinking so they do not continue to commit crimes.

The requested sentence adequately deters the general public. Research has consistently indicated that the certainty of punishment is more effective at achieving general deterrence than the severity of punishment. Indeed, "increases in severity of punishments do not yield significant (if any) marginal deterrent effects."

---

[8] Sered, Danielle, Until We Reckon, Violence Mass Incarceration and the Road to Repair. New York: The New Press, at 89-90.

Michael Tonry, *Purposes and Functions of Sentencing*, 34 Crime & Just. 1, 28 (2006). "Three National Academy of Science panels ... reached that conclusion, as has every major survey of the evidence." *Id. See also* Zvi D. Gabbay, *Exploring the Limits of Restorative Justice Paradigm: Restorative Justice and White Collar Crime*, 8 Cardozo J. Conflict Resol. 421, 447-48 (2007) ("certainty of punishment is empirically known to be a far better deterrent than its severity."); Steven N. Durlauf & Daniel S. Nagin, *Imprisonment and Crime: Can Both be Reduced?*, 10 Criminology & Pub. Pol'y, 37 (2011)[9] ("The key empirical conclusions of our literature review are that at prevailing levels of certainty and severity, relatively little reliable evidence of variation in the severity of punishment having a substantial deterrent effect is available and that relatively strong evidence indicates that variation in the certainty of punishment has a large deterrent effect, particularly from the vantage point of specific programs that alter the use of police."); Raymond Pasternoster, *How Much Do We Really Know About Criminal Deterrence*, 100 Crim. L. & Criminology 765, 817-18 (2010) (There is "no real evidence of a deterrent effect for severity ... [I]n virtually every deterrence study to date, the perceived certainty of punishment was more important than the perceived severity.").

Similar findings apply to the goal of specific deterrence. Research has found that deterrence is primarily a function of the *certainty of apprehension*, not the

[9] Available at http://onlinelibrary.wiley.com/doi/10.1111/j.1745-9133.2010.00680.x/pdf

severity of the punishment. *See* Nelson et al., *supra*, at 23; Daniel Nagin, *Incarceration & Public Safety*, ARNOLD VENTURES 4-5 (July 2022), available at https://craftmediabucket.s3.amazonaws.com/uploads/AVCJIReport_IncarcarationPublicSafety_Nagin_v2.pdf; Maurice J.G. Bun et al., *Crime, Deterrence and Punishment Revisited*, 59 Empirical Econ. 2303, 2329 (2019). Increasing prison term's length reduces recidivism by a negligible amount, if at all. *See* William Rhodes et al., *Relationship Between Prison Length of Stay and Recidivism: A Study Using Regression Discontinuity and Instrumental Variables with Multiple Break Points*, 17 Criminology & Pub. Pol'y 731, 733, 758 (2018); *Long Prison Terms*, *supra.*

Some courts, in departing from the guidelines, have relied in part on the notion that increases in the severity of punishment has little, if any, increased deterrent effect. In *United States v. Murray Lawrence*, 16-CR-243 (E.D.N.Y.), the Court heard testimony from Jeffrey Fagan, Ph.D., who described in detail that general deterrence is impacted by the risks of detection, and not the severity of punishment. *See Judgment, Memorandum, and Order on Sentencing*, at 3-8. Fagan testified that "the consensus of the literature is that deterrence effects really stop [with raising the risk of apprehension, and] that lengthy sentences don't add much to the cost benefit calculation." *Id.* at 5.

A 120-month sentence is sufficient to send a message both to the public and Mr. Jean-Baptiste that drug dealing will not be tolerated. Increasing the severity of Mr. Jean-Baptiste's punishment will have marginal, if any, additional deterrent

effects. Thus, the requested sentence achieves both general and specific deterrence as provided in § 3553(a)(2)(B).

**Conclusion**

Based on his history and characteristics, and the appropriate Guideline range after considering departures. the Court should sentence Mr. Jean-Baptiste to 120 months imprisonment.

Respectfully submitted,
**SAMUEL JEAN-BAPTISTE**,
By his attorney,

/s/ Michael Tumposky
Michael Tumposky
BBO # 660618
Tumposky & Associates, P.C.
88 Broad St., Suite 101
Boston, MA 02110
T) (617) 722-8220
F) (617) 507-8116
E) Tumposky@TumposkyLaw.com

**CERTIFICATE OF SERVICE**

I, Michael Tumposky, hereby certify that, on this 16th day of January, 2026, I served one true and correct copy of the foregoing, through the electronic filing system, on all parties of record in this matter.

/s Michael Tumposky
Michael Tumposky